**DAVID J. HOLDSWORTH (4052)**
Attorney for Plaintiff
9125 South Monroe Plaza Way, Suite C
Sandy, UT 84070
Telephone (801) 352-7701
Facsimile (801) 567-9960
david_holdsworth@hotmail.com

FILED
U.S. DISTRICT COURT

2019 NOV 25   A 10: 57

DISTRICT OF UTAH

BY:_____
DEPUTY CLERK
RECEIVED CLERK

NOV 19 2019

U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | | |
|---|---|---|
| JASON BEHAR, | : | **COMPLAINT** |
| | : | **(JURY TRIAL DEMANDED)** |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| STATE OF UTAH, UTAH | : | |
| DEPARTMENT OF HUMAN | : | |
| SERVICES, DIVISION OF JUVENILE | : | |
| JUSTICE SERVICES, WEBER | | Case: 1:19-cv-00133 |
| VALLEY DETENTION CENTER, and | | Assigned To : Jenkins, Bruce S. |
| JOHN DOES I-V, | | Assign. Date : 11/19/2019 |
| | | Description: Behar v. State of Utah et |
| Defendants. | | al |

COMES NOW the Plaintiff, Jason Behar, complains of Defendants State

of Utah, Utah Department of Human Services, Division of Juvenile Justice Services,

Weber Valley Detention Center, and John Does I-V, demands trial by jury and as and

for causes of action alleges as follows:

**JURISDICTION**

1.     This action is brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, for discrimination in employment and for retaliation. Jurisdiction is specifically conferred on this Court by 42 U.S.C. § 2000 e (5). Equitable and other relief are also sought under 42 U.S.C. § 2000 e (5) (g).  Where employment discrimination based upon disability is alleged, jurisdiction is conferred by the Americans with Disabilities Act ("ADA").  Jurisdiction is also based on 28 U.S.C. §§ 1331, 1332 and 42 U.S.C. § 1981, et. seq.

## PARTIES

2.     Jason Behar is a citizen of the United States and a resident of the State of Utah.

3.     Defendant Weber Valley Detention Center ("WVDC") is an employer which does business in the State of Utah in Weber County, and a subdivision of Defendant Division of Juvenile Justice Services ("DJJS"), which is a division within the Defendant Utah Department of Human Services, which is an executive department of the Defendant State of Utah.

4.     Defendants John Does I-V are individuals whose exact involvement in the fact pattern described below is not yet currently known or fully appreciated.

## NATURE OF CASE

2

5.     On or about July 15, 2015, the State of Utah DJJS hired Mr. Behar to work as a JJS Technician I at the WVDC.

6.     On or about July 18, 2015, DJJS hired Mr. Behar to work as a JJS Technician, in a temporary, time-limited, part-time, non-career-service (Schedule TL) status, to work graveyard shifts at the WVDC.  In July and through September 2015, there were between 26 and 29 employees at WVDC.  In July and August 2015, there were two other TL employees besides Mr. Behar.  Brian Bullock, formerly a JJS Technician I, had passed away.  Robert Montague was hired in May 2015 as a part-time JJS Technician I.  He resigned in August 2015 to continue with his full-time job in the Ogden City School District and was rehired in March 2016 as a JJS Counselor II at Millcreek Youth Center in Ogden, Utah.  Josh Coy was hired as a JJS Technician I in July 2015 and was promoted to a full-time JJS Technician II in August 2015.  He resigned in November 2015 to take a job outside of state government.  And Mr. Behar was hired in July 2015.  Mr. Behar suffers from a serious hearing loss.  He also suffers from post-traumatic stress disorder ("PTSD").  According to the Department of Veterans Affairs, he is 100% disabled, all service connected.  These disabilities substantially limit several major life activities, including his ability to hear, interact with others, sleep and work.

3

7.      On approximately September 18, 2015, Mr. Behar disclosed that he had a hearing disability to his immediate supervisor, Control Supervisor, Gayle Luker.  In connection with such a disclosure, Mr. Behar requested a reasonable accommodation.

8.      Thus, on approximately September 18, 2015, Gaye Luker ("Luker"), formerly a Control Center Supervisor with DJJS and Mr. Behar's supervisor, received a request from Mr. Behar to wear a head covering over his ears at work as a reasonable accommodation.  Luker told Mr. Behar that she would talk to Tracy Hart ("Hart"), the Associate Program Director ("APD") at WVDC about his request for accommodation, but reminded Mr. Behar of the DJJS Dress Code, policy No. 01-09, that prohibits DJJS youth detainees from wearing "hats, beanies, or any form of hood that covers the head from being worn indoors" at a DJJS youth facility.

9.      On September 23, 2015, Luker instructed Mr. Behar to contact DHS ADA Coordinators, Jay Jensen ("Jensen"), Kim Diamond Smith ("Smith") or Tina Sweet ("Sweet"), at DHRM as they could tell Mr. Behar how to proceed with his request.  Mr. Behar agreed to do so,

10.      On September 24, 2015, Mr. Behar contacted Tina Sweet, a Human Resources Specialist at DHRM, about his request for accommodation.

11.     On information and belief, Mr. Behar alleges that, when DJJS receives a request for reasonable accommodation from a DHS employee under the Vocational Rehabilitation Act or the Americans with Disabilities Act ("ADA"), its regular practice is to issue ADA forms to the employee and to require the employee and his medical provider to complete the forms.  DJJS may assert that such forms may help the ADA Coordinator understand to what extent the employee is a qualified individual with a disability and what specific reasonable accommodations are being requested by the employee and his medical provider to help him perform the essential functions of his job successfully.  On September 24, 2015, Tina Sweet supposedly sent such ADA forms to Mr. Behar.

12.     On October 6, 2015, Mr. Behar complained that his ears had hurt while he was working on his previous shift.  He told Luker that he "would be in pain because the weather was changing".

13.     Soon after Mr. Behar requested a reasonable accommodation, Jay Jensen got involved in the situation involving Mr. Behar's request for reasonable accommodation (Mr. Behar had contacted Tina Sweet and not Jay Jensen regarding his request for a reasonable accommodation and, at present, Mr. Behar does not know how or why Mr. Jay Jensen got involved in the discussion about reasonable accommodation).

14.     Thereafter, Luker told Jay Jensen that there were concerns with Mr. Behar's employment with DJJS regarding Mr. Behar's interactions with staff.

15.     On information and belief, Mr. Behar alleges such concerns may have had to do with a promotion he applied for, but for which he was not selected. During the week of October 11, 2015, Mr. Behar told Brenda Lloyd ("Lloyd"), a JJS Technician II, that he was upset about a conversation he had in August 2015 with Josh Coy ("Coy"), a JJS Technician II at WVDC. On information and belief, Mr. Behar alleges Brenda Lloyd reported the same to Luker. On October 16, 2015, Luker had a discussion with Lloyd about the conversation Lloyd had had with Mr. Behar. Brenda Lloyd told Luker that Mr. Behar "was verbally attacking Coy because Coy had been awarded a full-time job as a JJS Technician II. Lloyd told Luker that Mr. Behar had told Coy that he, Mr. Behar, was more qualified to perform the Tech II job than Coy was. Lloyd told Luker that Mr. Behar had "aggressively asked Josh what qualifications he had to fill the position" and that Mr. Behar "had verbally badgered [Coy] several times". Brenda Lloyd expressed her concerns to Luker about Mr. Behar's behaviors and told her that Mr. Behar "was a ticking time bomb who could blow" at any time.

16.     On information and belief, Mr. Behar alleges that Luker told Jay Jensen that, while Mr. Behar was considered and interviewed for the full-time JSS

6

Technician II position, he was not hired because he lacked interpersonal skills, did not

relate well with staff members and was not liked by, and did not get along with the

juvenile residents. On the other hand, Luker told Jensen that Coy demonstrated all of

the skills necessary to be successful in that position and was hired on August 15, 2015.

17.     On information and belief, Mr. Behar alleges that Coy had not

made a complaint about any interactions he had had with Mr. Behar. Nevertheless,

after Lloyd had passed this information on to Luker, and after Luker had passed this

information on to Jay Jensen, Jay Jensen decided to reach out to, contact and interview

Coy. Coy verified that Mr. Behar and Coy had had a conversation in August 2015,

after Coy got the full-time JJS Technician II job and that Mr. Behar had been upset

with Coy because Coy got the job that was open and Mr. Behar did not. According to

Coy, Mr. Behar had said to Coy, "What the fuck makes you think you qualified over

me and what are your qualifications?" Coy told Jay Jensen that, after the conversation,

he "laughed it off" and waited about a week and then tried to talk it out with Mr. Behar

by saying that he was sorry that Mr. Behar didn't get the job. Coy told Jay Jensen that

"people were scared of [Mr. Behar]".

18.     On information and belief, Mr. Behar alleges that Jay Jensen

asked Coy if Mr. Behar had ever spoken to him about his (Mr. Behar's) medical

condition. Coy told Jay Jensen that Mr. Behar had told him his ears would hurt in the

7

winter. Coy further stated that Mr. Behar told him he "was afraid to do the paperwork (regarding his request for reasonable accommodation) for fear of losing his job. He didn't want anyone looking into his medical background". Coy also stated that Mr. Behar also said, "if [management] looked deeper into his medical condition, he (Mr. Behar) would lose his job".

19. On information and belief, Mr. Behar alleges that Gaye Luker and Josh Coy informed Jay Jensen that Cami Berger ("Berger") had overheard the conversation between Mr. Behar and Coy about Coy getting the Technician II job. Cami Berger had never made a complaint about any interactions had had with Mr. Behar, but Jay Jensen also decided to reach out to, contact and interview Cami Berger. On information and belief, Mr. Behar alleges that Berger told Jensen that Mr. Behar said to Coy, "You're not more qualified than me. [You got the job] because you are bigger than me". Berger then explained that she had told Mr. Behar that the technician II job had nothing to do with size. Berger suggested to Mr. Behar that Mr. Behar simply talk to his supervisor, Gaye Luker, about why he did not get the full-time Technician II job.

20. In August 2015, Luker met with Mr. Behar to address his conversation with Josh Coy.

8

21.    On information and belief, Mr. Behar alleges that Luker later reported to Jay Jensen, "I took [Mr. Behar] into the visiting room for privacy and cameras, in case he got aggressive. I felt I was safer that way. He was scary." Luker reported to Jensen that she informed Mr. Behar that his conduct was "creating a hostile work environment and was unacceptable and could not happen again". According to Luker, Mr. Behar "apologized extensively for his actions".

22.    On information and belief, Mr. Behar alleges that both Luker and Coy came to believe that some employees were scared of Mr. Behar and that some employees, such as Brenda Lloyd, thought "he might bring a gun" to the workplace.

23.    On information and belief, Mr. Behar alleges that, on October 16, 2015, Lloyd had a conversation with Mr. Behar. Mr. Behar supposedly told Lloyd that he was angry and knew "who had told [management]" about his conversation with Josh Coy. Mr. Behar supposedly told Lloyd that "he should have 'flattened her'". Lloyd then supposedly asked Mr. Behar, "flatten who?" In answer to Brenda Lloyd's question, Mr. Behar supposedly answered, "Gaye and Cami". When Lloyd asked Mr. Behar, "what he meant by flatten?'" Mr. Behar supposedly responded, "Take her out" if it happened again.

24.    On information and belief, Mr. Behar alleges that Lloyd reported these statements to Luker.

25.     On information and belief, Mr. Behar alleges that, when Luker later met with Jay Jensen, Luker told Jay Jensen about what Lloyd had reported to her: "Flatten!  I was shocked!  I didn't know [Mr. Behar] was hostile to me.  He meant 'take her out!'" Luker informed Jay Jensen that, after Mr. Behar made the alleged statements, "the staff was scared and I was scared.  I knew he had been in the military.  Cami and I both live alone.  I told Cami he said that".

26.     On information and belief, Mr. Behar alleges that Luker also told Jay Jensen that she was afraid enough of what Mr. Behar might do to her that she "was sleeping with a loaded gun on my headboard" and that Luker also said to Jay Jensen, "I told my neighbors to watch my property and to notify me if anything was suspicious.  I have cameras in the house so I can monitor the outside."

27.     On information and belief, Mr. Behar alleges that Luker told Jay Jensen that Berger had reported that she slept with a loaded gun as well.

28.     Mr. Behar denies making any threatening statements to Gaye Luker, Josh Coy, Brenda Lloyd, Cami Berger or anyone else.

29.     On October 19, 2015, DJJS terminated Mr. Behar's employment.

30.     Mr. Behar alleges Defendant terminated Mr. Behar's employment because of his hearing disability and requests for accommodation and because of his

10

perceived disability of being mentally unstable and capable of engaging in workplace violence and that its reasons for terminating his employment are pretextual.

31.     On information and belief, Mr. Behar alleges that Luker recalled that, after DJJS terminated Mr. Behar's employment, "our fear and [Mr. Behar's] intimidation made me want to call the cops.  We were afraid he (Mr. Behar) might come back to the building."

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION
## VIOLATIONS OF THE VOCATIONAL REHABILITATION ACT AND ADA

32.     Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through 31 above as if alleged in full herein.

33.     In order to state a prima facie case of discrimination based on disability under the Vocational Rehabilitation Act and the ADA, Plaintiff must allege facts, which, if proven, would establish or tend to establish, that: (1) he is disabled in that he has a physical or mental impairment which is substantially limiting to a major life activity; (2) he was a qualified individual with a disability in that he could perform the essential duties of the position he held or desired, with or without reasonable accommodation; (3) Defendant subjected Plaintiff to adverse action(s); and (4) the circumstances surrounding the adverse action(s) give rise to an inference that Defendant took the adverse action(s) against Plaintiff because of his disability.

34. As to the first element, Mr. Behar alleges he suffers from various physical and mental impairments, including significant hearing loss.

35. Mr. Behar alleges such conditions substantially limit several of his major life activities, including hearing, concentrating, performing activities of daily living, coping with the demands of daily living, interacting with others, sleeping and working.

36. With respect to the second element, Mr. Behar alleges he was a qualified individual with a disability in that his successful performance of the duties of his job for several weeks demonstrated that he was able to perform the essential functions of the position he held or desired, with or without reasonable accommodation.

37. In regards to the third element, Mr. Behar alleges DJJS subjected him to adverse employment action. In *Piercy v. Maketa,* 480 F.3d 1192, 1203 (10th Cir. 2007), the Tenth Circuit held that an adverse employment action includes a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits". Mr. Behar alleges that, on October 19, 2015, DJJS subjected Mr. Behar to an adverse employment action when it terminated his employment.

12

38.     As to the fourth element, Mr. Behar alleges that the circumstances surrounding his the termination of his employment support the drawing of an inference that DJJS terminated his employment because of his disability and/or perceived disability.

39.     The Supreme Court has held that at least two circumstances give rise to an inference of discrimination: first, in *International Union, et al v. Johnson Controls, Inc,* 499 U.S. 187 (1991), the Court held that an employee may show she suffered disparate treatment, which, but for the employee's protected trait, would have been different or, second, in *Phillips v Martin Marietta Corp.,* 400 U.S. 542 (1971), the Court held that evidence that the protected trait actually motivated the employer's decision at issue can support an inference of discrimination on the basis of the protected trait.

40.     Mr. Behar alleges that DJJS treated him differently than it did similarly situated non-disabled employees.

41.     Mr. Behar also alleges his disability and requests for accommodation actually motivated DJJS' decision to take adverse action against him.

42.     Mr. Behar alleges that such termination was related to his disability in that Plaintiff alleges that, (a) before the DJJS terminated his employment, DJJS represented that there were no problems with his performance; (b) if Mr. Behar

13

was having any problems with his performance (which he denies), such were due to his disability and that coaching him to help him be aware of any performance problems and know how to improve his performance would have been a type of reasonable accommodation he needed; and (c) Mr. Behar also alleges that, had he had any problems with his performance and had he received such coaching, he could have and would have improved his performance and eliminated any purported reason to terminate his employment.

43.    Mr. Behar also alleges the short temporal proximity between his request for accommodation and the termination, the lack of legitimate, non-discriminatory reason for the termination, and the other circumstances surrounding his discharge alleged above give rise to an inference that DJJS discriminated against him on the basis of his disability.

44.    Mr. Behar alleges his allegations state a prima facie case of discrimination on the basis of disability.

45.    Mr. Beahr alleges DJJS terminated his employment for pretextual reasons.

46.    Mr. Behar alleges DJJS' actions and inactions, as alleged above, violated the Vocational Rehabilitation Act and the ADA.

**SECOND CAUSE OF ACTION**
**VIOLATIONS OF THE VOCATIONAL**

## REHABILITATION ACT AND ADA — RETALIATION

47.     Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through 46 above as if alleged in full herein.

48.     In order to state a prima facie case of retaliation under the Vocational Rehabilitation Act and ADA, Plaintiff must allege facts, which, if proven, would establish or tend to establish: (1) Plaintiff engaged in protected activity; (2) Defendant subjected Plaintiff to adverse employment action contemporaneous with or subsequent to the protected activity; and (3) there is a causal connection between Plaintiff's protected activity and the adverse employment action.

49.     In *Petersen v. Utah Dept of Corrections,* 301 F.3d 1182 (10th Cir. 2002), the Tenth Circuit held that a protected activity is one in which the individual has complained about discrimination, filed a charge of discrimination or opposed a discriminatory practice.  In *Wehrley v Am. Fam Mut. Ins. Co.,* 513 F. App'x 733, 740 (10th Cir. 2013), the 10th Circuit held that making requests for reasonable accommodation is a type of protected activity under the disability non-discrimination laws.

50.     As to the first element, Mr. Behar alleges that he engaged in protected activity when he informed DJJS of his disability and resulting limitations and requested various reasonable accommodations.

51.     In the *Burlington Northern* case, the Supreme Court held that an adverse action is any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the Plaintiff or others from engaging in a protected activity. In regards to retaliatory action, the courts have noted that adverse treatment also includes any act that might have dissuaded a reasonable worker from making or supporting a charge of discrimination.

52.     As previously alleged, Mr. Behar alleges that DJJS took adverse employment actions against him when it terminated his employment.

53.     In *University of Texas Southwestern Medical Center v. Nassar,* 570 U.S. (2013) citing *Gross v. FBL Financial Services, Inc ,* 557 U.S. 167 (2009), the Supreme Court held that statutes prohibiting retaliation require an employee to show that, "but for" his engaging in the protected activity, the employer would not have taken the adverse employment action at issue.

54.     Mr. Behar alleges a causal connection exists between Plaintiff's protected activity and the adverse actions DJJS thereafter took against him.  Mr. Behar alleges that, but for his protected activities, the DJJS would not have taken the adverse actions set forth above against him.

55.     Mr. Behar alleges that, very soon after he engaged in protected activity, DJJS took adverse action against him and terminated his employment.

56.     As to the third element, Mr. Behar also alleges a causal connection exists between his protected activity and the adverse action.  Mr. Behar alleges the existence of such a causal connection on several grounds, including the temporal proximity between his protected activity and the adverse action (approximately two weeks), and the means by which DJJS took adverse action against him (engaging in an unsolicited investigation of him and not providing him with any due process or progressive discipline) and the failure of DJJS to provide him with any facts to justify taking the adverse action against him.

57.     Thus, Mr. Behar alleges that, but for his disability and requests for reasonable accommodation, DJJS would not have taken adverse action against him.

58.     Mr. Behar alleges his allegations state a prima facie case of retaliation.

59.     Mr. Behar alleges DJJS terminated his employment for pretextual reasons.

60.     Mr. Behar alleges DJJS' actions and inactions, as alleged above, violated the Vocational Rehabilitation Act and the ADA.

### THIRD CAUSE OF ACTION
### DISCRIMINATION ON THE BASIS OF PERCEIVED DISABILITY

61.     Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through 60 above as if alleged in full herein.

17

62.     To establish that DJJS regarded Mr. Behar as having an impairment, Mr. Behar must allege facts which establish, or tend to establish, that: (1) he has an actual or perceived impairment; (2) that the impairment is neither transitory nor minor; and (3) the employer was aware of and therefore perceived the impairment at the time of the alleged discriminatory action.

63.     An individual is "regarded as having such an impairment" if s/he "is subjected to a prohibited action because of an actual or perceived physical or mental impairment, whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity". 42 U.S.C. §12102 (3) (A). For example, in *Adair v. City of Muskogee,* 823 F.3d 1297, 1305 (10th Cir. 2016), the court stated that "an impairment under the [regarded as disabled prong] need not limit or even be perceived as limiting a major life activity — the employer need only regard the employee as being impaired, whether or not the employer also believed that the impairment prevented the employee from being able to perform a major life activity". Further, the court stated that, to qualify, the impairment must not be "transitory and minor".

64.     Mr. Behar alleges that DJJS perceived him as having a mental impairment, which was neither transitory nor minor, that DJJS perceived the impairment at the time of the alleged discriminatory action and that DJJS' perception

of Mr. Behar governed and motivated its decision to terminate Mr. Behar's employment.

65.     In the instant case, Mr. Behar alleges that DJJS regarded him as having a mental disability/perceived that he had such a disability, that such an impairment was neither transitory nor minor an that, because of such perception — namely, that Mr. Behar was mentally unstable and might engage in workplace violence — DJJS terminated Mr. Behar's employment.

66.     Mr. Behar alleges his allegations state a prima facie case of discrimination on the basis of perceived disability.

67.     In the event DJJS is able to articulate a legitimate, non-discriminatory reason for taking adverse action against Mr. Behar, Mr. Behar alleges such reason will be pretextual in that the temporal proximity between DJJS regarding Mr. Behar as mentally impaired and capable of workplace violence and taking action to terminate Mr. Behar's employment is so short that it supports an inference of discrimination on the basis of regarded as disabled.

68.     Mr. Behar alleges DJJS' actions and inactions, as alleged above, violated the Vocational Rehabilitation Act and the ADA.

### DAMAGES

69.     DJJS' actions and omissions, as described above, have caused Mr. Behar losses, injuries and other damages.

70.     Such actions and omissions have caused Mr. Behar to experience the loss of wages and other benefits and privileges of his employment with DJJS, which has caused financial stress and consequential damages.

71.     Such violations have also caused Mr. Behar physical and psychological distress.

72.     Such violations have also caused damage to Mr. Behar's good name and employability.

73.     Accordingly, Mr. Behar alleges DJJS is liable to Mr. Behar for all wages, wage increases and benefits, and other compensation, to which he would have been able to earn and receive but for the violations of the Vocational Rehabilitation Act and the ADA, prejudgment interest on those losses, consequential damages, compensatory damages, plus prejudgment interest thereon, reasonable attorney's fees, and any other costs of this action, and for such other and further legal and equitable relief as this Court deems appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant and seeks the following relief:

20

1.     A declaration and judgment determining that the Defendant violated the Vocational Rehabilitation Act and is, therefore, liable to Mr. Behar for damages equal to his lost wages, lost employment benefits, and other compensation which was denied or lost to Mr. Behar as a result of the Defendant's violations of the Vocational Rehabilitation Act;

2.     For damages for financial stress, physical and psychological distress and damages to Mr. Behar's good name and employability;

3.     For prejudgment interest on his lost wages;

4.     For Mr. Behar's reasonable attorneys' fees, and any other costs of the action;

5.     For post-judgment interest on all amounts awarded to Mr. Behar herein accruing from the date of judgment to the date of satisfaction of judgment awarded herein; and

6.     For such other and further legal and equitable relief as this Court deems appropriate under the circumstances.

DATED this 19th day of November, 2019.

21

/s/ David J. Holdsworth
David J. Holdsworth
*Attorney for Plaintiff*